IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF OREGON

Timothy Y.,[1]                                              No. 1:22-cv-01570-HZ

                    Plaintiff,                    OPINION & ORDER

       v.

COMMISSIONER, SOCIAL
SECURITY ADMINISTRATION,

                    Defendant.

Katherine Eitenmiller
Katie Taylor
Wells, Manning, Eitenmiller & Taylor, P.C.
474 Willamette St
Eugene, OR 97401

      Attorneys for Plaintiff

Kevin C. Danielson
Assistant United States Attorney
District of Oregon
1000 SW Third Avenue, Suite 600
Portland, OR 97204

---

[1] In the interest of privacy, this Opinion uses only the first name and the initial of the last name of the non-governmental party or parties in this case. Where applicable, this Opinion uses the same designation for a non-governmental party's immediate family member.

1 – OPINION & ORDER

Corey Stephen Fazekas
Social Security Administration
Office of the General Counsel
6401 Security Blvd, 1520 Annex
Baltimore, MD 21235

     Attorneys for Defendant

HERNÁNDEZ, District Judge:

     Plaintiff Timothy Y. brings this action seeking judicial review of the Commissioner's final decision to deny supplemental security income ("SSI"). This Court has jurisdiction pursuant to 42 U.S.C. § 405(g) (incorporated by 42 U.S.C. § 1383(c)(3)). The Court affirms the Commissioner's decision.

## PROCEDURAL BACKGROUND

     Plaintiff applied for Disability Insurance Benefits ("DIB") and SSI on May 16, 2019, alleging an onset date of January 29, 2008. Tr. 294-309.[2] His application was denied initially and on reconsideration. Tr. 14. On December 15, 2020, Plaintiff amended his alleged onset date to May 16, 2019, and withdrew his DIB claim. Tr. 321.

     On September 8, 2021, Plaintiff appeared with counsel for a hearing before an Administrative Law Judge ("ALJ"). Tr. 14. On September 21, 2021, the ALJ found Plaintiff not disabled. Tr. 27. The Appeals Council denied review. Tr. 2.

## FACTUAL BACKGROUND

     Plaintiff alleges disability based on a right shoulder injury, neck pain, bipolar disorder, PTSD, manic depression, and anxiety. Tr. 378. At the time of his alleged onset date, he was 43 years old. Tr. 26. He has a limited education and no past relevant work. Tr. 26.

---

[2] Citations to "Tr." refer to the page(s) indicated in the official transcript of the administrative record, filed herein as Docket No. 9.

**SEQUENTIAL DISABILITY EVALUATION**

A claimant is disabled if they are unable to "engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which . . . has lasted or can be expected to last for a continuous period of not less than 12 months[.]" 42 U.S.C. §§ 423(d)(1)(A), 1382c(a)(3)(A). Disability claims are evaluated according to a five-step procedure. *See Valentine v. Comm'r*, 574 F.3d 685, 689 (9th Cir. 2009) (in social security cases, agency uses five-step procedure to determine disability). The claimant bears the ultimate burden of proving disability. *Id.*

In the first step, the Commissioner determines whether a claimant is engaged in "substantial gainful activity." If so, the claimant is not disabled. *Bowen v. Yuckert*, 482 U.S. 137, 140 (1987); 20 C.F.R. §§ 404.1520(b), 416.920(b). In step two, the Commissioner determines whether the claimant has a "medically severe impairment or combination of impairments." *Yuckert*, 482 U.S. at 140–41; 20 C.F.R. §§ 404.1520(c), 416.920(c). If not, the claimant is not disabled. *Id.*

In step three, the Commissioner determines whether the claimant's impairments, singly or in combination, meet or equal "one of a number of listed impairments that the [Commissioner] acknowledges are so severe as to preclude substantial gainful activity." *Yuckert*, 482 U.S. at 141; 20 C.F.R. §§ 404.1520(d), 416.920(d). If so, the claimant is conclusively presumed disabled; if not, the Commissioner proceeds to step four. *Yuckert*, 482 U.S. at 141.

In step four, the Commissioner determines whether the claimant, despite any impairment(s), has the residual functional capacity (RFC) to perform their "past relevant work." 20 C.F.R. §§ 404.1520(e), 416.920(e). If the claimant can perform past relevant work, the claimant is not disabled. If the claimant cannot perform past relevant work, the burden shifts to

the Commissioner. In step five, the Commissioner must establish that the claimant can perform

other work. *Yuckert*, 482 U.S. at 141–42; 20 C.F.R. §§ 404.1520(e)–(f), 416.920(e)–(f). If the

Commissioner meets their burden and proves that the claimant can perform other work that

exists in the national economy, then the claimant is not disabled. 20 C.F.R. §§ 404.1566,

416.966.

## THE ALJ'S DECISION

At step one, the ALJ determined that Plaintiff had not engaged in substantial gainful

activity after his amended alleged onset date. Tr. 16. Next, at steps two and three, the ALJ

determined that Plaintiff has the following severe impairments:

> mild degenerative disc disease of the lumbar spine; mild degenerative disc disease
> and spondylosis of the cervical spine; mild degenerative joint disease of the
> acromioclavicular joint of the right shoulder; bilateral carpal tunnel syndrome; a
> depressive, bipolar, or related disorder (variably called major depressive disorder,
> adjustment disorder, depression, depressive disorder NOS, major depression, other
> bipolar disorder, or bipolar depression); an anxiety disorder (variably called
> anxiety, anxiety disorder, and panic disorder); unspecified personality disorder; and
> posttraumatic stress disorder ("PTSD").

Tr. 16. However, the ALJ determined that Plaintiff's impairments did not meet or medically

equal the severity of a listed impairment. Tr. 17. At step four, the ALJ concluded that Plaintiff

has the residual functional capacity to perform light work as defined in 20 C.F.R. §§ 404.1567(b)

and 416.967(b) with the following limitations:

> [T]he claimant can occasionally lift/carry 20 pounds and frequently lift/carry 10
> pounds. He can stand and/or walk 6 hours and sit 6 hours of an 8-hour workday.
> The claimant can never climb ladders, ropes, or scaffolds, occasionally crawl, and
> frequently stoop, kneel, crouch, or climb ramps and stairs. He can occasionally
> reach overhead and frequently reach in all other direction with the bilateral upper
> extremities. He can frequently handle, finger, feel, or operate hand controls with
> the bilateral upper extremities. He can tolerate no exposure to hazards, including
> unprotected heights. Mentally, he is limited to understanding, remembering,
> carrying out, and maintaining attention and concentration on no more than simple
> tasks and instructions, defined specifically as those job duties that can be learned
> in up to 30 days' time. He can sustain only ordinary routines and make no more

than simple, work-related decisions. He can tolerate no more than occasional interaction with coworkers and supervisors, and he can have no interaction with the general public.

Tr. 19. The ALJ found that Plaintiff had no past relevant work. Tr. 26. But at step five, the ALJ found that there are jobs that exist in significant numbers in the national economy that Plaintiff can perform, such as "Folder," "Mail clerk," and "Marker." Tr. 27. Thus, the ALJ concluded that Plaintiff is not disabled. Tr. 27.

## STANDARD OF REVIEW

A court may set aside the Commissioner's denial of benefits only when the Commissioner's findings "are based on legal error or are not supported by substantial evidence in the record as a whole." *Vasquez v. Astrue*, 572 F.3d 586, 591 (9th Cir. 2009) (internal quotation marks omitted). "Substantial evidence means more than a mere scintilla but less than a preponderance; it is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Id.* (internal quotation marks omitted). The court considers the record as a whole, including both the evidence that supports and detracts from the Commissioner's decision. *Id.*; *Lingenfelter v. Astrue*, 504 F.3d 1028, 1035 (9th Cir. 2007). "Where the evidence is susceptible to more than one rational interpretation, the ALJ's decision must be affirmed." *Vasquez*, 572 F.3d at 591 (internal quotation marks and brackets omitted); *see also Massachi v. Astrue*, 486 F.3d 1149, 1152 (9th Cir. 2007) ("Where the evidence as a whole can support either a grant or a denial, [the court] may not substitute [its] judgment for the ALJ's.") (internal quotation marks omitted).

## DISCUSSION

Plaintiff argues that the ALJ erred by (1) finding that he had not rebutted the presumption of continuing non-disability, (2) rejecting his subjective symptom testimony, (3) finding the

medical opinion of Thomas Shields, Ph.D., less than fully persuasive, and (4) rejecting the lay testimony of his father. Pl. Op. Br. 5, ECF 12. The Court concludes that the ALJ did not harmfully err and therefore affirms the Commissioner's decision.

## I. Presumption of Continuing Non-Disability

A prior final decision that a claimant is not disabled creates a presumption of continuing non-disability. *Chavez v. Bowen*, 844 F.2d 691, 693 (1988); Acquiescence Ruling 97-4(9). The presumption does not apply if the claimant shows changed circumstances. *Lester v. Chater*, 81 F.3d 821, 827 (9th Cir. 1995), *as amended* (Apr. 9, 1996). Changed circumstances may include "[a]n increase in the severity of the claimant's impairment" or "the existence of an impairment not considered in the previous application." *Id.*

A different ALJ previously found Plaintiff not disabled in March 2014. Tr. 106. The ALJ evaluating Plaintiff's current application noted the prior decision, and wrote that the prior findings were "entitled to some res judicata consideration" based on *Chavez*. Tr. 24. The ALJ concluded that Plaintiff did not rebut the presumption that he continued to be able to work. Tr. 25. Plaintiff argues that this conclusion is erroneous because his current application includes severe impairments that were not considered in the previous application. Pl. Op. Br. 6. In the 2014 decision, Plaintiff was found to have the following severe impairments: "degenerative disc disease of the cervical spine, gunshot wound at the right upper extremity, depression, and posttraumatic stress disorder." Tr. 95. In the present application, the ALJ found additional severe impairments, including carpal tunnel syndrome, an anxiety disorder, and a personality disorder. Tr. 16. Plaintiff thus showed changed circumstances since his application was denied, and the presumption of continuing non-disability does not apply. The ALJ erred in holding otherwise.

Defendant argues that the error is harmless because the ALJ reviewed the medical evidence and independently assessed the RFC. Def. Br. 5, ECF 14. The Ninth Circuit has indicated that when an ALJ erroneously applies the presumption of continuing non-disability but also independently assesses the claimant's functioning, the error is harmless. *Plummer v. Berryhill*, 747 F. App'x 631, 632 (9th Cir. 2019); *Cha Yang v. Comm'r of Soc. Sec. Admin.*, 488 F. App'x 203, 204 (9th Cir. 2012). Defendant is correct that the ALJ performed an independent analysis. *See* Tr. 20-24. The application of the presumption was harmless. The Court proceeds to evaluate the validity of the ALJ's independent assessment of the record.

## II.    Subjective Symptom Testimony

The ALJ is responsible for evaluating symptom testimony. SSR 16-3p, 2017 WL 5180304, at *1 (Oct. 25, 2017). The ALJ engages in a two-step analysis for subjective symptom evaluation. *Molina v. Astrue*, 674 F.3d 1104, 1112 (9th Cir. 2012) (superseded on other grounds). First, the ALJ determines whether there is "objective medical evidence of an underlying impairment which could reasonably be expected to produce the pain or other symptoms alleged." *Id.* (internal quotations omitted). Second, "if the claimant has presented such evidence, and there is no evidence of malingering, then the ALJ must give specific, clear and convincing reasons in order to reject the claimant's testimony about the severity of the symptoms." *Id.* (internal quotations omitted).

When evaluating subjective symptom testimony, "[g]eneral findings are insufficient." *Reddick v. Chater*, 157 F.3d 715, 722 (9th Cir. 1998) (quoting *Lester v. Chater*, 81 F.3d 821, 834 (9th Cir. 1995)). "An ALJ does not provide specific, clear, and convincing reasons for rejecting a claimant's testimony by simply reciting the medical evidence in support of his or her residual functional capacity determination." *Brown-Hunter v. Colvin*, 806 F.3d 487, 489 (9th Cir. 2015).

Instead, "the ALJ must specifically identify the testimony she or he finds not to be credible and must explain what evidence undermines the testimony." *Holohan v. Massanari*, 246 F.3d 1195 (9th Cir. 2001); *see also Orteza v. Shalala*, 50 F.3d 748, 750 (9th Cir. 1995) (The reasons proffered must be "sufficiently specific to permit the reviewing court to conclude that the ALJ did not arbitrarily discount the claimant's testimony.").

Plaintiff wrote in his function report that he could not work due to constant pain that triggered his PTSD. Tr. 357. He also wrote that his bipolar disorder, anxiety, and depression kept him from working. Tr. 357. Plaintiff testified that he had pain in his neck, right shoulder, both wrists and hands, his back, and his right arm. Tr. 45. He was currently not taking pain medication because he chose not to. Tr. 45. He limited his activities to avoid pain. Tr. 45. He did physical therapy in 2019, which helped him learn how to stretch every day to move a bit better. Tr. 45. Plaintiff testified that he had problems with his hands every day. Tr. 46. His symptoms included a loss of strength and the inability to hold something tightly together. Tr. 46. He could reach for things if he moved slowly, but could not react quickly or stretch too far. Tr. 47. He had a limited range of motion in all directions in his right shoulder. Tr. 47. In his function report, Plaintiff indicated that he had trouble lifting, reaching, and using his hands. Tr. 362. He wrote that he could walk less than a mile without needing to rest. Tr. 362. He needed to rest for 20 to 30 minutes. Tr. 362.

In terms of his mental health, Plaintiff testified that he had episodes of both mania and depression. Tr. 47. He explained that during a manic episode, "I go extreme when something's wrong, it's really wrong for me[.]" Tr. 47. A manic episode usually lasted around ten to twelve hours. Tr. 48. It took Plaintiff about a day to calm down. Tr. 48. His manic episodes were random, and he did not know when they would happen. Tr. 48. The episodes could be triggered

by loud bangs behind him. Tr. 48. Plaintiff testified that when he was depressed, he would go into the bathroom and cry. Tr. 48. He tried to be alone and wait for the episode to end. Tr. 48. He said, "I guess I am depressed a lot" and "I'm constantly depressed, I guess, right now." Tr. 48. Plaintiff testified that with depression, "I don't have the courage and the confidence[.]" Tr. 49. He did not do things he wanted to do. Tr. 49.

Plaintiff testified that he had trouble keeping jobs because of his anger. Tr. 49. He explained that when he is angry, "I feel that every, they're out to get me or they're setting me up." Tr. 49. As an example, he stated that if he were sorting boxes in a manufacturing job and was told he was doing it wrong or told to do it differently, he would feel that "it's a personal thing against me." Tr. 49. He would get loud and say, "don't come at me like that, why are you coming at me like that." Tr. 50. Plaintiff stated that he had become violent when he was angry and "I yell and it's pretty scary." Tr. 50. He had lost jobs for that behavior. Tr. 50.

Plaintiff testified that he was not taking medication because he lived with older people and was worried about bringing an illness home to them during the pandemic. Tr. 50. Before that, he was homeless and lived in a tent. Tr. 50. It was hard to make appointments and get to them when he was homeless. Tr. 51. Plaintiff also testified that even with counseling and taking medication, he did not feel that his mental health had improved enough for him to be able to work. Tr. 51.

Plaintiff testified that he had trouble focusing and concentrating. Tr. 52. He would forget things and get nervous. Tr. 52-53. He would get a dry mouth and get hot and sweaty. Tr. 52-53. He stated that he would have to miss work because "[m]entally, to get up and go to -- and to think that I have to go out and to do work and to succeed in it physically where my range of motion and, and the type of work I have always done." Tr. 53.

In his function report, completed when he was still homeless, Plaintiff wrote that on a typical day, he would take his medication, find a shelter for the night, find food, and try to stay safe. Tr. 357. He indicated that he did not have problems with personal care. Tr. 358. He did not need reminders to take care of personal needs or medication. Tr. 359. He could prepare his own meals, but they were mostly sandwiches, canned food, and microwaveable food, because he was homeless when he completed his function report and did not have a stove or oven. Tr. 359. Plaintiff wrote that he did his laundry when he could and cleaned up after himself. Tr. 359. He needed encouragement to do these tasks because he lacked confidence and hope. Tr. 359. Plaintiff indicated that he could walk, ride a bicycle, and use public transportation. Tr. 360. He could go out alone, and he did not need reminders to go places. Tr. 360-361. He could shop in stores. Tr. 360. He could handle his finances. Tr. 360.

Plaintiff wrote that he had no hobbies or interests. Tr. 361. He did not spend time with others. Tr. 361. He had trouble getting along with others because his unstable emotions made it difficult to maintain relationships. Tr. 362. He struggled to become numb to his feelings. Tr. 362. He indicated trouble with memory, concentration, understanding, following instructions, completing tasks, and getting along with others. Tr. 362. He wrote that he could only pay attention for minutes because "my mind is constantly worried." Tr. 362. He indicted that he did not finish what he started. Tr. 362. He did not follow written instructions well, but followed spoken instructions "ok at the moment." Tr. 362.

Plaintiff wrote that he did not get along well with authority figures and was scared of the police. Tr. 363. He was expelled from school. Tr. 363. He wrote that he had been fired from jobs because of trouble getting along with others. Tr. 363. He wrote that he would feel threatened or put down and would react in anger. Tr. 363. He indicated that he did not handle stress or changes

in routine well. Tr. 363. He wrote that he became angry or scared when he should not be and that he was "always thinking the worst." Tr. 363.

The ALJ concluded that "the claimant's medically determinable impairments could reasonably be expected to cause some of the alleged symptoms; however, the claimant's statements concerning the intensity, persistence and limiting effects of these symptoms are not entirely consistent with the medical evidence and other evidence in the record[.]" Tr. 22. The ALJ discounted Plaintiffs' allegations about his physical impairments based on normal findings, conservative treatment, and improvement with treatment. Tr. 22. The ALJ discounted Plaintiff's allegations about his mental impairments based on normal mental status exams, the effectiveness of medication, and the lack of therapy during the relevant period. Tr. 22. The ALJ discounted all of Plaintiff's testimony based on his activities. Tr. 22-23. As the basis of the ALJ's decision is apparent, the Court rejects Plaintiff's argument that the ALJ merely summarized the medical evidence. *See* Pl. Op. Br. 15. Because Plaintiff directs his challenge to the ALJ's assessment of his mental health conditions rather than his physical conditions, the Court likewise focuses on Plaintiff's mental health conditions.

    A.  Activities of Daily Living

Contradiction with a claimant's activities of daily living is a clear and convincing reason for rejecting a claimant's testimony. *Tommasetti v. Astrue*, 533 F.3d 1035, 1039 (9th Cir. 2008). There are two grounds for using daily activities to support an adverse credibility determination: (1) when activities meet the threshold for transferable work skills, and (2) when activities contradict a claimant's other testimony. *Orn v. Astrue,* 495 F.3d 625, 639 (9th Cir. 2007). In order to impact a claimant's credibility, the activity has to be "inconsistent with claimant's claimed limitations." *Reddick v. Chater*, 157 F.3d 715, 722 (9th Cir. 1998). The ALJ cannot

mischaracterize statements and documents in the record or take these out of context in order to reach his or her conclusion on the claimant's credibility. *Id.* at 722-23. In addition, the claimant's ability to perform limited basic daily activities is not a clear and convincing reason to reject a claimant's testimony. *See id.* at 722 ("[D]isability claimants should not be penalized for attempting to lead normal lives in the face of their limitations."); *Webb v. Barnhart*, 433 F.3d 683, 688 (9th Cir. 2005) ("The mere fact that a plaintiff has carried on certain daily activities, such as grocery shopping, driving a car, or limited walking for exercise, does not in any way detract from [her] credibility as to [her] overall disability. One does not need to be utterly incapacitated in order to be disabled.") (internal quotation omitted).

The ALJ noted that Plaintiff reported he could "tend to his personal care and hygiene, clean his house, perform home repairs, prepare meals, do laundry, mow grass, shop in stores and handle his finances." Tr. 22. He also noted that Plaintiff helped care for his brother with multiple sclerosis and "reported he had a girlfriend, spends time with his family, shops in stores and takes public transportation." Tr. 22. Plaintiff does not dispute that the record shows he can do these activities, but argues that he had waxing and waning symptoms of mental illness. Pl. Op. Br. 15-16. The ALJ did not err in concluding that Plaintiff was independent in his basic activities such as personal care and hygiene, consistent with Plaintiff's report in his function report and in a report to a consultative examiner. Tr. 358, 1011-1012. Plaintiff's ability to do yardwork, laundry, and cleaning undermines his testimony about the severity of his physical limitations. The ALJ could also reasonably conclude that Plaintiff was somewhat less depressed than he stated based on his ability to complete all of these activities. But Plaintiff's ability to do chores, go shopping, and take public transit does not undermine his testimony about his social limitations. Plaintiff testified that he became angry and defensive when someone questioned him or tried to tell him

how to perform a task. His ability to take the bus or go to the grocery store does not undermine that testimony.

The record shows that Plaintiff could spend time with family but that his relationships were rocky. Plaintiff's father wrote in August 2019 that Plaintiff lived on his property in a trailer. Tr. 336. He wrote that Plaintiff's girlfriend lived with Plaintiff. Tr. 336. He wrote that Plaintiff "can't get along with people for a long period." Tr. 337. Plaintiff's father wrote that he and his spouse "don't want [Plaintiff] working in our home." Tr. 338. He wrote that Plaintiff "hollars [sic] at girlfriend daily and everyone else." Tr. 340. In contrast, Plaintiff reported to the consultative examiner in October 2019 that "he was last involved in a dating relationship around 2010." Tr. 1009. Plaintiff also reported that he had three children but only maintained contact with one of them. Tr. 1009. His other children felt that he had abandoned them. Tr. 1010. He told the examiner he had no friends in the area. Tr. 1010. He reported that he did spend time with his parents, that he helped care for his brother, and that he lived with his parents. Tr. 1010-1011. Plaintiff's function report, completed in April 2020, did not mention a significant other and indicated that Plaintiff did not spend time with others. Tr. 361. In May 2021, Plaintiff reported to a counselor that he did well with friends but did not make friends easily, and that he wanted to rebuild his relationship with the children he currently did not have contact with. Tr. 1113. While the record might support a finding that Plaintiff's social abilities were somewhat better than he claimed, it still shows significant social limitations. It can be reasonably interpreted to suggest an improvement in Plaintiff's social functioning over time, which is relevant because, as discussed below, the ALJ reasonably found that Plaintiff's conditions improved with treatment.

//

//

B.  Improvement with Treatment

Relevant factors for the ALJ to consider when evaluating symptom testimony include "[t]he type, dosage, effectiveness, and side effects of any medication" the plaintiff takes to alleviate symptoms, as well as treatment besides medication that relieves symptoms, and other measures used to relieve pain or other symptoms. 20 C.F.R. § 404.1529(c)(3)(iv)-(vi). "[E]vidence of medical treatment successfully relieving symptoms can undermine a claim of disability." *Wellington v. Berryhill*, 878 F.3d 867, 876 (9th Cir. 2017). *See also Kitchen v. Kijakazi*, 82 F.4th 732, 739 (9th Cir. 2023) (holding that the ALJ reasonably discounted the claimant's symptom testimony based on "a gradual improvement in his functioning with prescribed medication and psychotherapy sessions").

The ALJ found that Plaintiff's mental health symptoms improved with medication during the relevant period. Tr. 21. In September 2019, Plaintiff's provider recorded that Plaintiff's bipolar disorder appeared to be stable and noted that Plaintiff reported his moods as stable and denied worsening depression. Tr. 1040-1041. In January 2020, Plaintiff reported new anxiety and depression, but was hesitant to return to medication or do counseling. Tr. 1051. He had not taken medication for five years and felt that he had been relatively stable. Tr. 1051. His mental status exam was normal; he was not agitated or anxious. Tr. 1051. His provider started him on Abilify, and in February 2020, Plaintiff reported that he was responding extremely well to the medication and his symptoms had improved. Tr. 1053. Functioning was somewhat difficult, but he denied having a depressed mood, difficulty concentrating, diminished interest or pleasure, or feelings of guilt or restlessness. Tr. 1053.

In June 2020, Plaintiff reported that his symptoms had worsened, but also that he had run out of his medication at the beginning of the pandemic and had not refilled it. Tr. 1072. His

provider restarted the Abilify. Tr. 1072. In July 2020, Plaintiff reported that his moods had improved greatly, but he was still struggling with anxiety and depression. Tr. 1069. His provider increased the dose of Abilify. Tr. 1069. In August 2020, Plaintiff reported that his mood had continued to improve on Abilify, though less than he had expected. Tr. 1063. He declined a higher dose. Tr. 1063. Plaintiff continued not to attend counseling despite ongoing recommendations from his provider. Tr. 1063. In September 2020, Plaintiff reported that his moods were stable on Abilify, and he did not want to increase his dose. Tr. 1066. He continued to decline to participate in counseling. Tr. 1066. While he reported ongoing symptoms of anxiety and depression, including anxious, fearful, and compulsive thoughts, and difficulty concentrating, he reported no worsening symptoms. Tr. 1066. At an appointment for treatment of his wrist, the provider noted that Plaintiff had decreased concentration and was anxious/nervous and hyperactive. Tr. 1080. In January 2021, Plaintiff's moods continued to be stable. Tr. 1082. He reported that his functioning had been very difficult, but also that he had stopped taking Abilify and that his symptoms improved once he restarted. Tr. 1082. He also reported that his symptoms were usually worse around the holidays, and he already felt better. Tr. 1082. Counseling was once again recommended. Tr. 1082.

In May 2021, Plaintiff sought a mental health assessment. Tr. 1112. He reported ongoing mental health symptoms related to the experience of being shot by the police at age 14. Tr. 1112. The provider noted that Plaintiff had a euthymic mood and blunted affect. Tr. 1114. He was fully engaged and made appropriate eye contact, but had reduced volume and rate of speech. Tr. 1114. Plaintiff had great insight, judgment, and thought content, and no apparent thinking errors. Tr. 1114. He reported that he had been socially isolated. Tr. 1113. His prognosis was fair. Tr. 1115. At a counseling appointment in July 2021, Plaintiff had a euthymic mood and full affect; he was

fully engaged and made appropriate eye contact. Tr. 1120. He reported that he was still struggling but was looking to move into town to be closer to society. Tr. 1120. He had progressed in his goal of developing strategies to overcome his fear and anxiety from trauma. Tr. 1120. In July 2021, Plaintiff reported to his regular provider that he had stopped taking his medication for two months, but he believed counseling was beneficial. Tr. 1097. He stated that he felt better on the lower dose of medication, and his provider restarted the medication at that dose. Tr. 1097.

At a counseling appointment in August 2021, Plaintiff reported feeling depressed and hopeless. Tr. 1122. He showed a depressed mood but was fully engaged and made appropriate eye contact. Tr. 1124. He had great insight, judgment, and thought content, and made no apparent thinking errors. Tr. 1124. However, he appeared hopeless and was crying. Tr. 1124. His prognosis was good with weekly treatment. Tr. 1125. At another appointment later that month, Plaintiff appeared sad but had an "okay" week. Tr. 1126. He had some thinking errors and reported intense emotions. Tr. 1126. He was grieving the loss of contact with two of his children and felt that he could not work due to his emotions. Tr. 1126.

Plaintiff argues that the record shows waxing and waning symptoms. Pl. Op. Br. 15. Because mental health symptoms may wax and wane over time, the ALJ may not "pick out a few isolated instances of improvement . . . and [] treat them as a basis for concluding a claimant is capable of working." *Garrison v. Colvin*, 759 F.3d 995, 1017 (9th Cir. 2014). In this case, however, the record shows that Plaintiff's symptoms improved when he took medication and worsened when he stopped taking his medication. They also show that Plaintiff reported benefits from counseling, and that his providers felt his prognosis was fair to good. The ALJ reasonably

concluded that Plaintiff's symptoms improved when he consistently took his medication and sought counseling.

C. Conservative Treatment or Lack of Treatment

"[E]vidence of 'conservative treatment' is sufficient to discount a claimant's testimony regarding severity of an impairment." *Smartt v. Kijakazi*, 53 F.4th 489, 500 (9th Cir. 2022) (internal quotations omitted). *See also Parra v. Astrue*, 481 F.3d 742, 750-51 (9th Cir. 2007) (physical conditions treated with over-the-counter pain medication); *Tommasetti v. Astrue*, 533 F.3d 1035, 1040 (9th Cir. 2008) (physical conditions treated with "physical therapy and the use of anti-inflammatory medication, a transcutaneous electrical nerve stimulation unit, and a lumbosacral corset"). An ALJ may also consider a claimant's "unexplained or inadequately explained failure to seek treatment or to follow a prescribed course of treatment[.]" *Smolen v. Chater*, 80 F.3d 1273, 1284 (9th Cir. 1996).

The ALJ noted that Plaintiff stopped attending counseling for several years and did not restart therapy until 2021. Tr. 21-22. The ALJ also noted that Plaintiff sometimes stopped taking his medications. Tr. 21. Both of these observations were accurate. The record shows that Plaintiff stopped taking psychotropic medication in 2014 because he tested positive for methamphetamine and was cut off from his prescriptions. Tr. 1009. But Plaintiff does not explain why he remained unmedicated for five years. Notably, Plaintiff reported to Dr. Shields in 2011 that his psychotropic medication helped control his feelings of anger, in addition to his anxiety and depression. Tr. 461. As for counseling, the record shows that resources were available to Plaintiff, and his provider repeatedly encouraged him to go during the relevant period, but Plaintiff continued to refuse until mid-2021. When he finally did go to counseling, he found it helpful, but he also stopped taking his medications. The record supports the ALJ's conclusion

that if properly medicated and treated, Plaintiff's mental health conditions are not disabling. The ALJ reasonably discounted Plaintiff's testimony about the severity of his mental health symptoms based on Plaintiff's decision not to seek medication or to stop taking his medication and to decline counseling for years.

Plaintiff correctly notes that his bilateral carpal tunnel syndrome was a new impairment since the previous denial of his application for benefits. Pl. Op. Br. 6. Although Plaintiff does not appear to challenge the ALJ's assessment of his carpal tunnel syndrome, the Court briefly notes that the ALJ correctly stated that Plaintiff's provider recommended conservative treatment of that condition. Tr. 21 (citing Tr. 1082). *See also* Tr. 1087. The ALJ also included manipulative limitations in the RFC. Tr. 19. Plaintiff does not challenge the adequacy of those limitations. The ALJ did not err in his assessment of Plaintiff's carpal tunnel syndrome.

Plaintiff does not appear to challenge the ALJ's assessment of his other physical conditions, but the Court will also address them briefly. The ALJ did not err in finding that Plaintiff's back, neck, and shoulder impairments improved with conservative treatment, namely, physical therapy and ibuprofen. Tr. 22 (citing Tr. 1021, 1023, 1047, 1066). And Plaintiff testified that he was choosing not to take any pain medication, and provided no explanation for that decision at the hearing. *See* Tr. 45. The ALJ reasonably discounted Plaintiff's testimony about the severity of his pain and mobility limitations. The ALJ also included several limitations in the RFC to account for these symptoms, and Plaintiff does not challenge the adequacy of those limitations.

D.  Objective Medical Evidence

An ALJ may discount a claimant's testimony based on a lack of support from objective medical evidence, but this may not be the sole reason. *See Burch v. Barnhart*, 400 F.3d 676, 680

(9th Cir. 2005) (holding that "an ALJ may not reject a claimant's subjective complaints based
solely on a lack of medical evidence to fully corroborate the alleged severity of pain."); *Taylor v.
Berryhill*, 720 F. App'x 906, 907 (9th Cir. 2018) (explaining that a "lack of objective
medical evidence cannot be the sole reason to discredit claimant's testimony," and therefore
holding that the ALJ failed to provide clear and convincing reasons for discounting the
claimant's testimony) (citation omitted); *Heltzel v. Comm'r of Soc. Sec. Admin.*, No. 19-1287,
2020 WL 914523, at *4 (D. Ariz. Feb. 26, 2020) (stating that "[b]ecause the ALJ's other reasons
for rejecting Plaintiff's testimony were legally insufficient, a mere lack of objective support,
without more, is insufficient to reject Plaintiff's testimony."). However, "[w]hen objective
medical evidence in the record is *inconsistent* with the claimant's subjective testimony, the ALJ
may indeed weigh it as undercutting such testimony." *Smartt v. Kijakazi*, 53 F.4th 489, 498 (9th
Cir. 2022).

   The ALJ noted that mental status exams from before Plaintiff's amended alleged onset
date usually showed unremarkable findings. Tr. 21. The ALJ also noted occasional abnormal
findings, such as an anxious or depressed mood, poor eye contact, and pressured speech. Tr. 21.
The ALJ went on to say that "[e]xams from the relevant period were largely unremarkable and
did not support disabling limitations." Tr. 21. Plaintiff does not challenge that conclusion,
instead arguing that the ALJ improperly focused on the mental status exams without considering
the descriptions of Plaintiff's symptoms provided by Plaintiff and others. Pl. Op. Br. 14-15. But
as discussed above, Plaintiff himself reported that his symptoms improved with medication and
that counseling was beneficial. The ALJ reasonably concluded that the abnormal findings in
mental status exams, and in Plaintiff's report of his symptoms, were due in significant part to
Plaintiff's inconsistent medication regimen and decision not to seek counseling until mid-2021.

In sum, the ALJ did not err in discounting Plaintiff's testimony about the severity of his symptoms.

### III.     Medical Opinion Evidence

For claims filed on or after March 27, 2017, ALJs are no longer required to give deference to any medical opinion, including treating source opinions. Rules Regarding the Evaluation of Medical Evidence, 2017 WL 168819, 82 Fed. Reg. 5844-01 (Jan. 18, 2017); 20 C.F.R. §§ 404.1520c, 416.920c. Instead, the agency considers several factors. 20 C.F.R. §§ 404.1520c(a), 416.920c(a). These are: supportability, consistency, relationship to the claimant, specialization, and "other factors." 20 C.F.R. §§ 404.1520c(c)(1)-(5), 416.920c(c)(1)-(5). The "most important" factors in the evaluation process are supportability and consistency. 20 C.F.R. §§ 404.1520c(b)(2), 416.920c(b)(2).

Under this framework, the ALJ must "articulate . . . how persuasive [they] find all of the medical opinions" from each doctor or other source. 20 C.F.R. §§ 404.1520c(b), 416.920c(b)(2). In doing so, the ALJ is required to explain how supportability and consistency were considered and may explain how the other factors were considered. 20 C.F.R §§ 404.1520c(b)(2), 416.920c(b)(2). When two or more medical opinions or prior administrative findings "about the same issue are both equally well-supported . . . and consistent with the record . . . but are not exactly the same," the ALJ is required to explain how the other factors were considered. 20 C.F.R. §§ 404.1520c(b)(3), 416.920c(b)(3). "Even under the new regulations, an ALJ cannot reject an examining or treating doctor's opinion as unsupported or inconsistent without providing an explanation supported by substantial evidence." Woods v. Kijakazi, 32 F.4th 785, 792 (9th Cir. 2022).

Plaintiff challenges the ALJ's handling of Dr. Shields's opinion on Plaintiff's mental limitations. Pl. Op. Br. 6. Dr. Shields first performed a psychodiagnostic evaluation of Plaintiff in October 2011 as part of Plaintiff's first application for benefits. Tr. 460-465. Plaintiff reported that he had been taking Celexa for his depression and anxiety since 2010, and had not had significant problems with depression and anxiety as an adult before then. Tr. 461. He reported that Celexa worked well and that it helped control his problems with anger. Tr. 461. He reported occasionally crying at home alone and that he felt lonely when his girlfriend went to work. Tr. 461. Plaintiff reported anger and sadness surrounding being shot in 2014, but did not show a full PTSD profile. Tr. 461. Plaintiff reported anxiety in crowds and stated that he would feel that people were staring at him. Tr. 461.

Dr. Shields found Plaintiff's speech "mildly monotonous but normal in volume and rate." Tr. 463. Plaintiff's mood was anxious, and he became tearful when speaking about being shot and about not seeing his children. Tr. 463. He claimed he could not do the serial task. Tr. 463. He could spell the word "world" forwards and backwards and repeat a string of seven digits forwards and five digits backwards. Tr. 463. His registration appeared intact, as did his recent recall. Tr. 463. Plaintiff's cognition, reasoning, and perception were somewhat below average. Tr. 463. Plaintiff was independent in most of his daily activities. Tr. 464. He reported maintaining contact with two friends from California and his brothers, and spending time with his girlfriend and parents most days. Tr. 464.

Dr. Shields opined that Plaintiff was capable of understanding, remembering, and carrying out short and simple instructions, and that his persistence and pace were mildly impaired due to his anxiety and depression. Tr. 464. Plaintiff had the judgment to make simple work-related decisions and maintain awareness of normal work-related hazards. Tr. 464. Plaintiff

would experience moderate anxiety and agitation in response to criticism from supervisors or coworkers. Tr. 464.

In October 2019, Dr. Shields again evaluated Plaintiff. Tr. 1008-1013. He noted that Plaintiff attended counseling between 2014 and 2015 but had not received counseling since then. Tr. 1009. Plaintiff reported that he quit taking Celexa in 2011. Tr. 1009. He took Depakote between 2011 and 2014, and at some point he took Klonopin. Tr. 1009. Plaintiff stopped taking his medications in late 2014 after his providers found meth in his system, and he had not resumed them. Tr. 1009.

Plaintiff reported that he was continuously depressed over the course of five years. Tr. 1010. He would get excited for an hour or two and then fall back into depression. Tr. 1010. He had low motivation, no hobbies, and no friends in the area. Tr. 1010. He helped care for his older brother who had multiple sclerosis. Tr. 1010. Plaintiff cried during the interview and reported guilt about his poor relationship with his younger children. Tr. 1010. Plaintiff reported a fear of police officers since he was shot by one at age 14. Tr. 1010. He denied other symptoms of PTSD. Tr. 1010. He reported that he struggled with work because he had poor communication and would feel like people were making fun of him or yelling at him. Tr. 1010. He would become angry, yell, and go home and cry. Tr. 1010. He had lost jobs because of this behavior. Tr. 1011.

Dr. Shields found Plaintiff's speech normal in volume, rate, rhythm, and tone. Tr. 1011. Plaintiff's mood appeared depressed, and he cried often. Tr. 1011. His affect was appropriate, and he maintained appropriate eye contact, participated in the evaluation without resistance, and abided by typical rules of social discourse. Tr. 1011. Plaintiff did not know the date but was otherwise oriented. Tr. 1011. He correctly spelled the word "world" forwards and backwards, and could recite seven digits forwards and four backwards. Tr. 1011. His memory appeared

normal. Tr. 1011. Plaintiff's cognition, reasoning, and perception were within the normal range. Tr. 1011. Plaintiff was independent in his activities of daily living. Tr. 1011-1012.

Dr. Shields concluded that Plaintiff likely did not have bipolar disorder but did have depression and anxiety, as well as some symptoms of PTSD. Tr. 1012. Plaintiff's situational stressors and family issues exacerbated his depression and anxiety. Tr. 1012. Dr. Shields opined that Plaintiff was "capable of understanding, remembering, and carrying out short and simple instructions." Tr. 1012. Plaintiff was distracted by his depression and anxiety at times, which indicated that he might have trouble with complex or detailed instructions. Tr. 1012. For the same reason, Dr. Shields stated that Plaintiff was "likely to experience mild difficulty sustaining concentration on tasks over extended periods of time." Tr. 1012. He described Plaintiff as socially withdrawn and noted his history of problems with authority figures. Tr. 1012. He wrote that Plaintiff's "[p]ersistence and pace are expected to be negatively impacted by his depression and anxiety." Tr. 1012. Plaintiff's prognosis was guarded, mostly because he was not taking psychiatric medication or attending counseling and had ongoing situational stressors and was smoking too much marijuana. Tr. 1012.

The ALJ found Dr. Shields's opinions less than fully persuasive. Tr. 23. The ALJ found the opinions "well supported by citations to objective findings from his examinations of the claimant." Tr. 23. The ALJ found the opinions consistent with Plaintiff's "minimal treatment" and largely normal mental status exams. Tr. 23. The ALJ discounted the opinions because they "were based upon one time examinations, including one done years before the relevant period." Tr. 23. The ALJ also concluded that Dr. Shields's "opinions appeared based largely on the claimant's subjective complaints." Tr. 23-24. Finally, the ALJ found that "the limitations in his

opinion were vague and did not adequate [sic] described [sic] the full range of the claimant's abilities and limitations." Tr. 24.

Plaintiff first argues that the ALJ erred in discounting Dr. Shields's opinion based on the examinations being one-time examinations. Pl. Op. Br. 10-11. In support, Plaintiff points to regulations stating that an examination of the claimant may result in a better understanding of the claimant's impairments than simply reviewing the record. *Id.* Dr. Shields himself noted that the information in his report "was obtained under restricted conditions and through limited observation, which may limit its reliability and validity." Tr. 1012. The ALJ reasonably concluded that a one-time evaluation of Plaintiff was less persuasive than multiple evaluations of Plaintiff, such as those found in his treatment notes. This is particularly true given that Plaintiff's symptoms improved with medication after the evaluation.

The ALJ reasonably found Dr. Shields's opinion consistent with Plaintiff's other mental status exams and his minimal treatment. As discussed above, the ALJ correctly noted that Plaintiff's anxiety and depression improved with medication, and that he declined counseling for most of the relevant period before starting in mid-2021 and finding it helpful. Dr. Shields found Plaintiff's prognosis guarded because he was not taking any medication or receiving counseling, had ongoing situational factors, and was smoking too much marijuana. Tr. 1012. Because Plaintiff later began treating his conditions and the treatments improved his symptoms, the ALJ properly noted Plaintiff's minimal treatment in assessing the persuasiveness of the opinion.

Next, Plaintiff argues that the ALJ erred in rejecting Dr. Shields's opinion as overly reliant on self-reporting of symptoms. Pl. Op. Br. 11. Plaintiff correctly states that a clinical interview is an objective measure that cannot be discounted as merely a self-report. *Id.* (citing *Buck v. Berryhill*, 869 F.3d 1040, 1049 (9th Cir. 2017)). The ALJ erred in suggesting otherwise.

But because the ALJ identified other valid reasons to discount the opinion, the error was harmless.

Finally, Plaintiff argues that the ALJ erred in rejecting Dr. Shields's opinion as too vague. Pl. Op. Br. 11-12. "An ALJ may reasonably reject ambiguous terms like 'fair' or 'limited' as 'inadequate for determining [residual function capacity]' because they are not useful in describing a claimant's functional limitations." *Ford v. Saul*, 950 F.3d 1141, 1156 (9th Cir. 2020). The ALJ reasonably concluded that part of Dr. Shields's opinion was vague. The opinion was not vague to the extent that Dr. Shields stated that Plaintiff could understand, remember, and carry out short and simple instructions. Tr. 1012. The ALJ credited this part of the opinion and incorporated it into the RFC by limiting Plaintiff to understanding, remembering, carrying out, and maintaining attention and concentration on simple tasks and instructions. Tr. 19. This limitation is also consistent with Dr. Shields's opinion that Plaintiff was mildly limited in his ability to sustain concentration on tasks over extended periods of time. Tr. 1012. That portion of the opinion is vague, but it was also accounted for.

Dr. Shields's opinion was also vague to the extent that he described Plaintiff as socially withdrawn and having a history of problems with authority figures. Tr. 1012. He did not explain what limitations in his ability to work Plaintiff faced based on those impairments. Similarly, Dr. Shields was vague in stating that "[p]ersistence and pace are expected to be negatively impacted by [Plaintiff's] depression and anxiety." Tr. 1012. He did not explain the degree of limitation. Because these portions of the opinion were vague, the ALJ did not err in rejecting them. The ALJ limited Plaintiff to occasional interactions with coworkers and supervisors and no interactions with the general public. Tr. 19. Plaintiff argues that the ALJ should have explained how those limitations accounted for Plaintiff's impaired social functioning and negatively

impacted persistence and pace. Pl. Op. Br. 11-12. The ALJ was not required to do so, and Plaintiff proffers no additional limitations that he believes should have been included in the RFC based on Dr. Shields's observations. He has not shown that the ALJ harmfully erred in evaluating Dr. Shields's opinion.

## IV.    Lay Witness Testimony

"Lay testimony as to a claimant's symptoms is competent evidence that the Secretary must take into account." *Nguyen v. Chater*, 100 F.3d 1462, 1467 (9th Cir. 1996) (citation omitted); 20 C.F.R. §§ 404.1529(c)(1), 416.929(c)(1) ("In evaluating the intensity and persistence of your symptoms, we consider all of the available evidence from your medical sources and nonmedical sources about how your symptoms affect you."). Under the 2017 regulations, the ALJ is not "required to articulate how [they] considered evidence from nonmedical sources" using the same criteria required for the evaluation of medical sources. 20 C.F.R. §§ 404.1520c(d), 416.920c(d). Under the new regulations, however, the ALJ must still articulate their assessment of lay witness statements. *Tanya L.L. v. Comm'r Soc. Sec.*, 526 F. Supp. 3d 858, 869 (D. Or. 2021).

The ALJ must give reasons "germane to the witness" when discounting the testimony of lay witnesses. *Valentine,* 574 F.3d at 694. But the ALJ is not required "to discuss every witness's testimony on an individualized, witness-by-witness basis." *Molina*, 674 F.3d at 1114, *superseded on other grounds* by 20 C.F.R. § 404.1502(a). If the ALJ gives valid germane reasons for rejecting testimony from one witness, the ALJ may refer only to those reasons when rejecting similar testimony by a different witness. *Id*. Additionally, where "lay witness testimony does not describe any limitations not already described by the claimant, and the ALJ's well-supported

reasons for rejecting the claimant's testimony apply equally well to the lay witness testimony," any error by the ALJ in failing to discuss the lay testimony is harmless. *Id*. at 1117, 1122.

Plaintiff's father submitted a third-party function report in August 2019. Tr. 336-343. He wrote that Plaintiff lived on his parents' property in a trailer with his girlfriend. Tr. 336. He wrote that Plaintiff tried to do cleaning and repairs but could not concentrate to complete anything. Tr. 337. He wrote that Plaintiff "can't get along with people for a long period." Tr. 337. Plaintiff had no problems handling his personal care. Tr. 337. He did not need reminders to take care of personal needs, but did need reminders to take medication. Tr. 338. Plaintiff prepared sandwiches and microwavable meals daily, and it took him a normal amount of time to do so. Tr. 338. He could do household chores and yardwork, but he did not complete these tasks. Tr. 338. He would scream and yell if anyone tried to tell him to do them. Tr. 338. Plaintiff's father wrote that he and his spouse did not want Plaintiff working in their home. Tr. 338.

Plaintiff's father wrote that Plaintiff could go grocery shopping two to three times per month. Tr. 339. He could count change but could not pay bills, handle a savings account, or use a checkbook. Tr. 339. His disability had not affected his ability to do those things. Tr. 339. Plaintiff's father wrote that Plaintiff "can't concentrate, plan or complete a project, gets frustrated and angry." Tr. 340. He needed reminders to go places and needed to be accompanied. Tr. 340. Plaintiff would be nice to others for a time and then become "nasty" in cycles. Tr. 340. He had no social life or friends and yelled at his girlfriend every day. Tr. 340.

Plaintiff's father indicated that Plaintiff had trouble talking, hearing, understanding, following instructions, completing tasks, concentrating, remembering, and getting along with others. Tr. 341. He indicated no physical limitations. Tr. 341. Plaintiff could not pay attention for long and did not finish what he started. Tr. 341. Plaintiff did not follow written or spoken

instructions very well. Tr. 341. He did not get along with authority figures very well. Tr. 341. He

had been fired from a job because of his behavior. Tr. 341. Plaintiff's father wrote that Plaintiff

did not handle stress or changes in routine well. Tr. 342. He wrote that Plaintiff "fears

everything" and thinks everyone is after him. Tr. 342. Plaintiff's father wrote that he and his wife

had a restraining order against Plaintiff and that Plaintiff had screamed at them several times

since he began living on the property. Tr. 343. He expressed hope that Plaintiff would see a

doctor and take medication. Tr. 343.

    The ALJ noted that the statement had been provided and wrote, "I am not required to

articulate how I considered evidence from nonmedical sources, such as his father, in the body of

the decision and decline to do so." Tr. 24. The ALJ erred in declining to give germane reasons to

discount the statement. Defendant argues that the error was harmless because Plaintiff's

testimony and his father's testimony are "substantially the same." Def. Br. 10-11. Plaintiff

counters that his father's statement "describes angry outbursts not clearly mirrored by Plaintiff's

own testimony, and the ALJ identified no basis to reject these observations." Pl. Reply 4, ECF

15. On the contrary, Plaintiff testified that he became angry when he felt people were coming

after him, and he would yell. Tr. 49-50. Plaintiff's testimony and his father's testimony are

substantially the same. As discussed above, the ALJ validly discounted Plaintiff's testimony

about limitations from his mental health conditions based on his failure to seek treatment and his

improvements when he did treat his conditions. Plaintiff's father completed his statement before

Plaintiff resumed medication or counseling. The error in failing to discuss the father's statement

is harmless.

//

//

**CONCLUSION**

Based on the foregoing, the Commissioner's decision is AFFIRMED.

IT IS SO ORDERED.

DATED:___February 28, 2024_____.


MARCO A. HERNÁNDEZ
United States District Judge